UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 3, 2006
Decided October 24, 2006

**Before**

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 05-4685

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>JOSE LUIS CASTANEDA-GALVAN,<br>*Defendant-Appellant*. | Appeal from the United States District Court for the Northern District of Indiana, Fort Wayne Division.<br><br>No. 05 CR 14<br><br>William C. Lee,<br>*Judge*. |

## O R D E R

A jury found federal prisoner Jose Luis Castaneda-Galvan guilty of attempting to escape from the Allen County Jail in Ft. Wayne, Indiana. *See* 18 U.S.C. § 751(a). The district court sentenced him to 24 months' imprisonment on the escape charge to run consecutively to his undischarged term on prior drug convictions. Castaneda-Galvan now appeals, arguing that there was insufficient evidence to convict him of attempted escape. We affirm.

In 2004, Castaneda-Galvan was convicted of distributing D-amphetamine hydrochloride, and possessing methamphetamine with the intent to distribute. *See* 21 U.S.C. § 841(a)(1). The district court ultimately sentenced him to a total of 108 months' imprisonment on prior drug convictions. However, while awaiting

sentencing on the drug counts at the Allen County Jail, Castaneda-Galvan was caught burning a window in the cell of fellow inmate William Middleton and was charged with attempting to escape from the jail  in violation of 18 U.S.C. § 751(a).

At Castaneda-Galvan's jury trial on the escape charge at issue here, the government's first witness was Middleton, who acknowledged testifying under a grant of immunity.  Middleton testified that he was an inmate with Castaneda-Galvan and that both of their cells were located in the "B Block" of the jail; Middleton was in cell 1216, and Castaneda-Galvan was in cell 1213.  On approximately November 14 or 15, 2004, Middleton testified, he and Castaneda-Galvan were in Middleton's cell when Castaneda-Galvan noticed that the outside glass pane of Middleton's double-paned window was shattered and suggested that they try to escape from the jail by breaking through the inside shatterproof plastic window that remained.  The inmates planned to make holes in the plastic window and then use heated, waxy mattress twine to cut "belts" out of the rest of the window.

Middleton explained to the jury that he began the process by heating paper clips and pushing them into the plastic until they went all the way through.  At that point, they attempted to pull the mattress twine through the holes, but this process was too time-consuming and unsuccessful because the twine kept breaking. Castaneda-Galvan then tried to enlarge the holes by taking screws Middleton removed from a shower vent and turning them into the paper-clip holes using a metal plate as a screwdriver.  When this did not work, Middleton suggested that they burn the window with "wicks," which Middleton described as pieces of towel held together by string and covered with hair grease, baby oil, and toothpaste. Middleton explained that the baby oil helped keep the fire burning and the toothpaste reduced the smoke smell and kept the smoke from burning black.

In order to light the wicks, Middleton testified, he took a paper clip connected to a piece of rubber and inserted that into an electrical outlet located 10 feet from the outside of his cell.  Middleton explained that this would cause sparks to fly from the outlet, and those sparks would ignite toilet paper that he held in his other hand. He then took the flaming toilet paper into his cell and ignited the wicks.  Once the wicks were on fire, Middleton testified, Castaneda-Galvan held the wicks to the plastic window until it started to melt and "bubble out."  Once it had bubbled, Castaneda-Galvan used the metal plate to scrape out the melted plastic, which Middleton then flushed down the toilet.

To avoid detection by the guards, Middleton testified, he put wet toilet paper and bags over the window in his cell door so that the guards could not see inside and so that his cell mates would think he was using the toilet. He then acted as a lookout while Castaneda-Galvan worked on the window, and would warn him when guards were coming. In an attempt to keep the smoke from filling the room, Middleton explained, he put a mattress over the toilet bowl and then pushed the mattress into the toilet bowl until all of the water was absorbed into the mattress. Without water in the bowl, the toilet acted as a suctioning device and would suck down much of the smoke caused by the wicks.

Middleton continued that on November 18, 2004, a few days into their plan, he was acting as a lookout when he heard keys. Castaneda-Galvan told Middleton to sit on the toilet and make it look like he was using the restroom, which he did. When the guards unlocked the door to Middleton's cell, he got up from the toilet and began putting his jumpsuit on while Castaneda-Galvan remained seated on the bed by the window. Middleton then left the room at the guards' direction.

Middleton further testified that he believed he and Castaneda-Galvan would have been able to escape through the square hole they were making; he explained that he thought their heads could fit through the hole, and he believed that if his head could fit through so would the rest of his body. Once they squeezed through the window, Middleton explained, they planned to land on the roof and then run across I-beams until they found a place to jump down outside the jail grounds. Middleton also explained that before his arrest he had drawn artwork for use at a tattoo parlor, but he denied drawing any artwork for inmates to use for tattoos while imprisoned. He further testified that while confined in B Block he had never seen Castaneda-Galvan make ink for tattoos and had never seen him tattoo another inmate.

The Sergeant on duty the night of November 18, 2004, Amy Jones-Schild, testified that she had received a note written by an inmate stating that the occupants of cells 1216 and 1213 were going to attempt to escape through the window in cell 1216 that night. When she and other officers entered cell 1216 to investigate, Jones-Schild testified, she found wicks and hair gel on the top bunk.

Guard Andrew Keller testified that upon entering cell 1216 he observed Castaneda-Galvan sitting on the top bunk, covered in what looked like soot. He also told the jury that he noticed a strong burning smell and observed that the window looked like it had been partially melted. Keller then escorted Castaneda-Galvan to the receiving area at the jail and, as he was doing so, noticed a black

substance on Castaneda-Galvan's hands and uniform as well as several stains that "looked like they had been caused by an oily substance."

Guard Maria Sabanski testified that, before entering cell 1216 the night of November 18, 2004, she noticed that a paper bag was covering the window on the cell door. As she entered the cell, she observed Castaneda-Galvan sitting on the top bunk near a burn mark on the right-hand corner of the cell's window and saw Middleton sitting on the toilet with his jumpsuit down to his waist, but noticed that he was not disrobed as he would be if he were using the restroom. Sabanski also testified that the items she recovered from the cell included a bottle of baby oil from the window sill, torn sheets, two wicks, an ink pen, a pencil, a metal plate, a bottle of gel, and plastic from the window.

The lieutenant on duty that night, Roger Compton, testified that as he entered cell 1216 that night he noticed paper near the bottom of the door that was being used to limit the air drafts in and out of the cell, and observed that the cell had a "considerable amount of smoke in it." Lieutenant Compton also said he saw an inmate sitting on the toilet with his uniform halfway down, and observed Castaneda-Galvan sitting on the top bunk next to a window that appeared to have soot on it and a wick that looked like it had been burning. Further, Compton said, he noticed that Castaneda-Galvan's uniform was "covered with a dark soot like substance that had some wet spots on it," and that his hands also appeared to have "traces of soot" on them. Finally, Compton testified that he knew from working at the jail for 13 years that inmates had once used soot for tattooing, but had switched to ink in the early 1990s after restrictions on possessing pens were relaxed. And even when the inmates had made soot for tattoos, Compton added, he had never seen them make it by melting a plastic window, nor in his 13 years had he ever seen a window damaged in the manner Middleton and Castaneda-Galvan had damaged the window in cell 1216.

The defense began its case by presenting the testimony of Dennis Epps, an inmate also housed in B Block at the time of Castaneda-Galvan's alleged escape attempt. Epps testified that on the evening of November 18, 2004, he reported to guards that a switch plate was missing from his wall. He also testified that he had firsthand knowledge regarding "jailhouse tattoos," and said he believed that inmates who gave tattoos burned plastic and mixed it with shampoo to make "ink." Epps then told the jury that he thought Castaneda-Galvan had given tattoos to other inmates, but that he had never seen him give any tattoos, and that around November 18, 2004, Middleton had told him he was working with Castaneda-Galvan to get ink for a tattoo.

Antwaine Gray, another inmate housed in the B Block on November 18, 2004, testified that he had arranged for Castaneda-Galvan to tattoo "Fort Kaine" (a reference to cocaine) on his hands in exchange for several commissary items. Gray also testified that Middleton had already done the artwork for his tattoo, but that he had never paid Middleton for his work and he no longer had the paper on which Middleton had supposedly drawn it.

Finally, Castaneda-Galvan testified that he was in Middleton's cell on November 18, 2004, but was there to make tattoo ink. He stated that when he went into Middleton's cell around 6:30 p.m. the wicks were already made and one of the wicks was burning. He admitted melting plastic from potato chip bags to make soot to mix with shampoo to make ink, but he testified that he did not melt the window, nor was he in the cell when the plastic was removed from the window.

In rebuttal, the government called guard Jeffery Kroemer, who testified that the jail prohibits making tattoo ink or tattooing other prisoners. In his eight years as a disciplinary officer at Allen County Jail, he testified, he had seen tattoo kits that included shampoo bottle caps, sharpened staples, and ballpoint pens, but he had never seen inmates make ink for tattoos by burning windows.

On appeal Castaneda-Galvan argues that there is insufficient evidence to support the jury's guilty verdict because Middleton's testimony was "so incredible that no rational jury could have believed it." Specifically, Castaneda-Galvan points to the size of the hole that had been cut—12 inches by 8 inches—and insists that "the idea that two grown men would attempt to escape through a hole in a window [this size] defies all credibility and common sense." Castaneda-Galvan also characterizes Middleton's testimony regarding their plan to cut the plastic using a waxy-twine string as "so ridiculous it renders Middleton's testimony inherently unreliable."

When reviewing challenges to the sufficiency of the evidence, we view all evidence in the light most favorable to the government and will reverse a jury's verdict only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Hale*, 448 F.3d 971, 982 (7th Cir. 2006). We will overturn a jury verdict only if it finds that the record contains no evidence, whether weighed in a light most favorable to the prosecution or the defense, from which the jury could have found guilt beyond a reasonable doubt. *United States v. Johnson*, 437 F.3d 665, 675 (7th Cir. 2006). Under this standard of

review, the appellant faces a "nearly insurmountable" hurdle.  *Hale*,  448 F.3d at 982.

To meet its burden under § 751(a), the government was required to prove that 1) Castaneda-Galvan was lawfully in the custody of the Attorney General of the United States, and 2) he knowingly attempted to leave custody without authorization to do so.  18 U.S.C. § 751(a); *United States v. Richardson*, 687 F.2d 952, 961 (7th Cir. 1982); 7th Cir. Pattern Jury Instr. Crim. § 751 (1999).  Because Castaneda-Galvan stipulated to the first element, we need only examine whether the evidence of the second element, when viewed in the light most favorable to the government, was sufficient to support the jury's guilty verdict.

Castaneda-Galvan presents no compelling argument that the government's evidence was insufficient to support this verdict.  Middleton testified that he and Castaneda-Galvan intended to escape from the Allen County Jail on November 18, 2004.  He then described to the jury in great detail how they had attempted to do so using paper clips and twine to cut the window and, when that did not work, how they used wicks to melt the window.  Although Castaneda-Galvan argues that Middleton's story regarding the twine was "ridiculous," Middleton admitted that this method of cutting the window did not work, and that they decided to burn the window instead, a method that was much more successful as evidenced by the testimony of Middleton and the numerous officers who observed the burned window, as well as by the pictures presented at trial showing long, missing strips of the plastic window that had been burned away.  Furthermore, although Castaneda-Galvan insists that it would have been "patently physically impossible" for the two men to escape through a 12-inch by 8-inch hole, there was no reason for the jury to believe that the inmates would not have enlarged the hole had a first attempt proved unsuccessful and, even so, factual impossibility is no defense to a prosecution for attempt.  *See United States v. Johnson*, 376 F.3d 689, 694 (7th Cir. 2004) ("Futile attempts because of factual impossibility are attempts still the same." (quotations and citation omitted))*; United States v. Lange*, 312 F.3d 263, 268 (7th Cir. 2002).

It is the role of the factfinder, not this court, to weigh evidence and make credibility determinations.  *See United States v. Brown,* 328 F.3d 352, 355 (7th Cir. 2003).  Here, the jury chose to credit Middleton and the guards over Castaneda-Galvan and, on this record, we can find no reason to overturn the jury's verdict.

AFFIRMED.